**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES STUCKEY, ) | |
| ) | |
| Petitioner, ) | |
| v. ) | Case No. 04 C 8061 |
| ) | |
| CHARLES L. HINSLEY, ) | Judge Virginia M. Kendall |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION AND ORDER**

A jury in the Circuit Court of Cook County, Illinois, convicted Petitioner of attempted murder

and aggravated criminal sexual assault. The court sentenced Petitioner to consecutive sentences of

60 years for attempted murder and 40 years for aggravated criminal sexual assault. Petitioner

appealed the judgment to the Illinois Appellate Court and Illinois Supreme Court; each court

affirmed his conviction and sentence. Petitioner then filed a state petition for post-conviction relief;

the Illinois Circuit Court, Appellate Court and Supreme Court each dismissed or denied his petition.

Petitioner now has filed a federal petition for a writ of habeas corpus under 28 U.S.C. § 2254

wherein he asserts that: (1) his right to due process was denied because the state trial court dismissed

his petition for post-conviction relief without an evidentiary hearing; (2) his Sixth Amendment right

to effective assistance of counsel was violated at trial; (3) his Sixth Amendment right to effective

assistance of counsel was violated on direct appeal; and (4) his sentence is unconstitutional under

the Sixth and Fourteenth Amendments.

As to certain issues in his first ground for relief and as to his third ground for relief, Petitioner

did not exhaust the available state court remedies. Because Petitioner has not demonstrated that the

failure to consider these issues would result in a fundamental miscarriage of justice, these non-

exhausted issues are procedurally defaulted. As to his remaining claims, the state court's decision was neither contrary to, or an unreasonable application of, United States Supreme Court precedent, or premised on an unreasonable determination of facts. Accordingly, Petitioner is not entitled to a writ of habeas corpus.

## Factual Background

Petitioner James Stuckey ("Petitioner" or "Stuckey"), living as Alvin Martin, was arrested in Atlanta, Georgia and extradited back to Chicago on August 11, 1994 to stand trial for his role in the March 29, 1986 attack of a then 14-year-old girl, "T.S." A warrant had been issued for Stuckey's arrest on April 15, 1986. The Chicago Police Department had been looking for Stuckey continuously from March 1986 until he was captured in Atlanta in 1994. Two other men – Felix Stuckey, Petitioner's brother, and Bruce Davis – had been tried and convicted earlier for their roles in the attack. The evidence and testimony produced at the trials of Felix Stuckey and Bruce Davis are not part of the record before this Court.

T.S. testified at Petitioner's trial. T.S. stated that on March 28, 1986, Stuckey approached her and asked her if she wanted to make some extra money. T.S. had run away from home a few weeks earlier and she agreed to work for him not knowing what he had in store for her. The work Stuckey provided was to sell T.S. for sex to five separate men. T.S. engaged in the prostitution. The following day, March 29, Stuckey returned and again asked T.S. to prostitute herself. This day, T.S. refused but agreed to go for a ride with Stuckey, Felix Stuckey and Bruce Davis in the brown Grenada that Petitioner was driving. T.S.'s father, who had been looking for her, testified that he saw T.S. in a brown Grenada near his home at approximately 1:00 p.m., and that he wrote down the license plate number of the car. T.S. jumped out of the car and ran away when she saw her father.

T.S.'s father chased after her but T.S. evaded him and returned to the men and the Grenada. Later, T.S. got out of the car, left them men and went to speak with a friend. Shortly after, while T.S. was walking alone on the street, Petitioner, Stuckey and Davis drove up again in the Grenada and this time forced her back into the car at gunpoint.[1] The men drove her to a wooded area and all three men sexually assaulted her at the same time. After the attack, and due to what the men believed was T.S.'s "disrespect," Davis tied T.S. to the rear bumper of the Grenada and Stuckey sped away dragging the naked 14-year old behind the car.

Mary Merrill ("Merrill") heard her dogs barking loudly at her back door on March 30 at approximately 12:30 or 1:00 a.m. She opened the door and saw T.S. covered in red marks. Merrill went inside and called the police. When police arrived they found T.S. naked, covered in dirt and with severe injuries. Dr. Demestra Soter examined T.S. when she was brought to the hospital. T.S. sustained third-degree burns to one-third of her chest, the top of her arm and half-way down her shoulders; fifty percent of the skin on the right side of her face was scraped off and seventy percent of the skin from the left side of her face was scraped off, making the bones and muscles at the edge of her eye sockets visible; and a portion of her right ear was missing. T.S. remained in the hospital for nine months and underwent numerous surgeries to repair her injuries.

The day T.S. was brought to the hospital, she was reunited with her parents and her mother gave police the license plate number of the brown Grenada that T.S.'s father had written down when he had seen T.S. in the car. A Vitullo kit for sexual assault identification was taken but the State never tested the kit. An assistant state's attorney went to Cook County Hospital to show T.S. a photo

---

[1] T.S. did not mention the gun to police, the assistant state's attorney or in her testimony at the trials of Petitioner's co-offenders.

array. T.S. could not speak due to the swelling around her mouth. The assistant state's attorney showed T.S. seven or eight pictures of African-American men, including an arrest photo of Petitioner from a prior unrelated arrest. When T.S. saw the picture of Petitioner she groaned and nodded her head. The pictures from the hospital photo array were never produced to the defense, despite two defense motions made prior to trial. T.S. told her therapist soon after the identification that she could not identify the men who assaulted her. Later, at Petitioner's trial, T.S. testified that she had lied to her therapist because she did not like him. On cross examination, she testified that she had admitted the truth of her attack to one doctor and one other individual, "Miss Cole."

At the time of the incident, Lorraine Washington ("Washington") was working at the Tropic Lounge in Chicago and dating Petitioner. Washington testified at trial that, on the night of the assault, she arrived at work around 7:30 p.m and Petitioner arrived at approximately 9:30 p.m. During the time at the Tropic Lounge, Stuckey was never out of her sight for more than a couple of minutes. Washington left the lounge with Stuckey at 4:00 a.m.

When originally questioned by police shortly after the incident, Washington denied knowing Petitioner in spite of displaying a photo of him in her home. Washington informed police that she did not have knowledge of Petitioner's whereabouts. Eight years later, law enforcement officers arrested Petitioner in Atlanta, Georgia where he was living under an alias with Washington and their child. Prior to the trial, over eight years after the incident, Washington never told authorities that Stuckey was with her throughout the evening of March 29th and into the morning of March 30th.

Petitioner exercised his Fifth Amendment right not to testify at his trial.

## Procedural Background

On October 25, 1995, a Cook County jury convicted Petitioner of attempted murder and

aggravated criminal assault. Petitioner filed a motion for a new trial which was denied. The court sentenced Petitioner to consecutive sentences – an extended term of 60 years on attempted murder and 40 years on aggravated criminal sexual assault. Petitioner appealed, contending that: (1) T.S.'s identification was insufficient to prove him guilty beyond a reasonable doubt; (2) the prosecution's comments during rebuttal closing argument were improper and deprived him of a fair trial; (3) the trial court abused its discretion in sentencing him to extended, consecutive terms of 60 years for attempted murder and 40 years for aggravated criminal sexual assault; and (4) he was deprived of effective assistance of counsel due to his lawyer's failure to object to the prosecutor's improper comments and his lawyer's failure to challenge his sentence. On September 19, 1997, the Illinois Appellate Court affirmed Petitioner's conviction and sentence. (Exhibit B to Respondent's Answer).[2]

Stuckey filed a petition for leave to appeal to the Illinois Supreme Court contending that the appellate court incorrectly concluded: (1) that T.S.'s uncorroborated, substantially impeached identification of him as one of her assailants was sufficient to prove guilt beyond a reasonable doubt; and (2) that the petitioner was not denied effective assistance of counsel when his attorney failed to object to the prosecutor's improper and erroneous comments during closing argument and failed to file a motion challenging the petitioner's sentence. (Exhibit C). On December 3, 1997, the Illinois Supreme Court denied the petition for leave to appeal. (Exhibit D).

On February 18, 1997, Stuckey filed a petition for post-conviction relief in the state court. (Exhibit E). Petitioner and his counsel also filed several supplements to the petition. (Exhibits F,

---

[2] All cited exhibits are those exhibits attached to Respondent's Answer unless otherwise indicated.

H, and J). The State filed two motions to dismiss. (Exhibits G and I). In his petition and supplements, Stuckey contended that: (1) he was denied due process because the State failed to preserve the victim's Vitullo kit, to produce the photo array allegedly shown to the victim during her hospitalization, to tender the victim's complete mental history, to provide evidence that could have impeached T.S., specifically, a 1991 Chicago Tribune article, and the State made improper statements to the jury; (2) the evidence did not prove Petitioner's guilt beyond a reasonable doubt; (3) the prosecutor knowingly introduced perjured testimony; (4) Petitioner was denied effective assistance of trial counsel because his attorney failed to: (a) fully investigate and support his alibi theory of defense, (b) file appropriate motions, (c) adequately challenge the competency of T.S., (d) challenge the missing Vitullo Kit, and (e) properly advise Petitioner regarding his right to testify; and (5) he was denied effective assistance of appellate counsel because counsel did not raise on appeal many of trial counsel's failures. Without holding an evidentiary hearing, the court granted the State's motion to dismiss on September 13, 2000. (Exhibit K). The court dismissed many of the claims on grounds of res judicata and waiver. (Exhibit K, C286). Other claims were denied on the merits. (Exhibit K, C286-92). Petitioner filed a motion to reconsider or, in the alternative, leave to file a successive petition, (Exhibit L), which was denied on October 17, 2000. (Exhibit M).

Petitioner appealed the denial of his post-conviction petition. On appeal, Petitioner raised three issues: (1) whether the post-conviction petition made a substantial showing that his constitutional right to effective assistance of counsel was violated because trial counsel failed to call an available witness who would have significantly impeached the complaining witness's testimony, failed to suppress the hospital photo identification and failed to move for discovery sanctions for the state's non-production of the hospital photo array; (2) whether the extended and consecutive

sentences were imposed in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (3) whether his extended sentence for aggravated criminal sexual assault is void due to the trial court's finding that there was a substantial change in the criminal objective. (Exhibit N). On June 18, 2003, the Illinois Appellate Court affirmed his conviction and sentence. (Exhibit Q). The same court denied Stuckey's petition for rehearing, (Exhibit R), on October 6, 2003. (Exhibit S).

Stuckey then filed a petition for leave to appeal to the Illinois Supreme Court contending that the trial court erred in dismissing his post-conviction petition. In this petition, he alleged: (1) that trial counsel was ineffective for failing to call an available witness who could have significantly impeached T.S.'s testimony, and (2) that the appellate court inappropriately applied the *Strickland v. Washington* standard when reviewing the propriety of his second stage post-conviction dismissal. (Exhibit T). On January 28, 2004, the Illinois Supreme Court denied Petitioner's petition for leave to appeal. (Exhibit U).

On or about December 8, 2004, Petitioner filed a federal habeas petition alleging: (1) his right to due process was violated when the trial court dismissed his post-conviction petition without an evidentiary hearing where petitioner alleged ineffective assistance of trial counsel when counsel: (a) failed to call an available witness who would have impeached the complaining witness' testimony; (b) failed to suppress a hospital photo identification; and (c) failed to move for discovery sanctions when the State failed to comply with the rules of discovery; (2) Petitioner was denied the effective assistance of counsel on direct appeal where his attorney failed to: (a) raise trial counsel's ineffectiveness; (b) raise an issue of the State's mishandling of the Vitullo kit; (c) raise any other issues that should have been evident from the record; and (3) his extended term sentence is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

**Discussion**

Petitioner's § 2254 petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 322-23, (1997); *Benefiel v. Davis*, 357 F.3d 655, 659 (7th Cir. 2004). Under AEDPA, a federal district court may issue a writ of habeas corpus when a prisoner is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But before a federal court will consider his claims, a federal habeas petitioner must exhaust any available remedies provided by the state. *See* 28 U.S.C. § 2254(b)(1)(A). In order to exhaust those state remedies, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). During this one complete round, a petitioner must present fully and fairly the federal law or constitutional protection violated and the operative facts underlying the violation, thus affording the state courts a "meaningful opportunity to pass upon the substance of the claim later presented in federal court." *Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001). A petitioner in Illinois completes one round by presenting his claims on either direct appeal or post-conviction review at each stage of the appellate process, including to the Illinois Supreme Court. *O'Sullivan*, 526 U.S. at 847-48; *see White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (applying *O'Sullivan* rule to claims presented in petitions for state post-conviction relief). Issues that are not presented exhaustively through one complete round are procedurally defaulted and usually cannot be reviewed in a federal habeas proceeding. *See O'Sullivan*, 526 U.S. at 848. Procedural default may be excused only when a petitioner can show "cause for the default and prejudice therefrom or made out a compelling case of actual innocence." *Lee v. Kemna*, 534 U.S. 362, 405 (2002); *see Schlup v. Delo*,

513 U.S. 298, 315 (1995) (petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent").

If a petitioner exhausts his state remedies, the scope of federal review under § 2254 is still narrow. A federal court shall not grant habeas corpus relief unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or the state court's determination of the facts was unreasonable in light of the evidence. 28 U.S.C. § 2254(d). A state court decision is contrary to clearly established federal law "when the state court applies a rule that contradicts the governing law set forth by the Supreme Court or, on facts materially indistinguishable from the facts of an applicable Supreme Court precedent, reaches a different result." *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006) (internal citations omitted). Similarly, a state court decision unreasonably applies clearly established federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 245 (7th Cir. 2003) (internal quotations omitted). A state court determination of the facts is unreasonable when it falls "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). In determining whether the decision was unreasonable, a federal court reviews the last state court decision with an explanation or written opinion. *See Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990) ("Unexplained affirmances or denials of discretionary review do not retract a state-law basis of decision already given").

## I.     State Court Denial of Evidentiary Hearing

Plaintiff claims that his right to due process was violated when the trial court dismissed his

state post-conviction petition without an evidentiary hearing. In appealing his state post-conviction petition, Petitioner challenged the trial court's dismissal of his petition without an evidentiary hearing only on state law grounds – the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* A claim for relief in a petition for writ of habeas corpus under § 2254 must seek to vindicate a right protected under the laws, treaties or Constitution of the United States – it is not the role of a federal court to review state court decisions on state law issues. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, if the Illinois courts incorrectly applied the Illinois Post-Conviction Hearing Act, this Court cannot correct that error. As Petitioner never identified a federal basis for his claims to the state courts, his first ground for relief has been procedurally defaulted. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (a petition must "indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal'"); *Harrison v. McBride*, 428 F.3d 652, 661 (7th Cir. 2005) (prisoner must alert the state court to the federal nature of the claim).

In any event, Petitioner does not have a federal right to an evidentiary hearing because he has not shown "[1] a factual predicate that could not have been previously discovered through the exercise of due diligence" or "[2] the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e); *see Porter v. Gramley*, 112 F.3d 1308, 1317 (7th Cir. 1997) ("The new § 2254 . . . curtails the availability of evidentiary hearings to develop material facts"). As explained *infra* with regard to Petitioner's other claims, even if this Court were to accept Petitioner's allegations as true at an evidentiary hearing, he is not

entitled to relief. *See Hampton*, 347 F.3d at 244 ("[A] habeas petitioner is entitled to an evidentiary hearing . . . if he has alleged facts that would entitle him to relief and the state courts, for reasons not attributable to him, denied him a full and fair hearing to explore those facts").

## II.     Ineffective Assistance of Trial Counsel

Petitioner alleges that his trial counsel was constitutionally ineffective because he failed to (a) call an available witness who could have impeached T.S.'s testimony; (b) to suppress the hospital photo identification; and (c) to move for discovery sanctions when the State failed to comply with the rules of discovery. Petitioner does not contend that the Illinois Appellate Court's decision was "contrary to" clearly established law. Indeed, the Appellate Court cited and applied the proper standard for attorney effectiveness as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Instead, Petitioner contends that the state court unreasonably applied the *Strickland* standard. *Strickland* requires Petitioner to show that his trial counsel's performance fell below an objective standard of reasonableness, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See id.* at 688, 694.

### A.     Failure to Call Rose Martin to Testify

Petitioner argues that his trial counsel was ineffective because he failed to call Rose Martin as a witness. Having raised the issue to each court during the state post-conviction process, Petitioner has exhausted his state remedies as to this issue. *See White*, 192 F.3d at 608. In an affidavit in support of Petitioner's direct appeal, Martin swore:

> 1.     That I remember receiving a phone call from Mrs. Stuckey during the early morning hour of March 31, 1986, in which she told me how the police had just left her house looking for her son, Felix. And she wanted me to beep James to see if he could find his brother.

11

2.    That I did beep James and located him right after I received the call from his mother. I asked James had he seen his brother because his mother wanted him to call the police station. I went on to ask James where he was, and he informed me that he was at the Tropic Lounge waiting for his friend to gett off work. I could hear loud noise and music in the background.

3.    That I owed a brown Ford Granada during the time of the offense that James is now convicted of. But there was no rear bumper on the car inwhich to tie anything on. And I subsequently sold the car to a close friend who car testify to this fact, and the condition of the car.

4.    That I was never contacted nor interviewed by James lawyer, nor anyone from attorney Weinberg office concerning what I knew about James whereabouts on the date and time of the crime, and the brown Ford Grenada in question.

5.    That I did show up at James trial expecting to testify but his attorney, Mr. Weinberg only said to me in the Courthouse hallway, "so you must be Rose", and that was all.

(Affidavit of Rose Martin ("Martin Aff.") (errors in original).

The Illinois Appellate Court found that Petitioner "failed to demonstrate that his trial counsel's performance fell below an objective standard of reasonableness, or that there is a reasonable probability that but for his counsel's failure to call Martin, the results of the proceeding would have been different." (Exhibit Q at 5.) The Appellate Court first noted that matters of trial strategy, such as which witness to call at trial, were within the discretion of trial counsel and generally immune from challenge. (Exhibit Q at 5.) The Appellate Court relied predominantly, however, on the prejudice prong of *Strickland*. (Exhibit Q at 5.) The Appellate Court cited the significant evidence implicating Petitioner, including the extensive injuries suffered by T.S., the father's identification of Petitioner's vehicle and the reliability of the victim's identification of Petitioner. (Exhibit Q at 5-6.) Reviewing the evidence in total, the Appellate Court found that Petitioner did not demonstrate a reasonable probability that the outcome of the trial would have been different if his counsel had called Martin. (Exhibit Q at 5.)

### 1.     Reasonableness of Trial Counsel's Performance

A counsel's performance at trial is measured against an objective standard, *see Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms"), and a court begins with a strong presumption that counsel's conduct was reasonable. *Id.* at 689. Petitioner thus must overcome the "presumption that . . . [counsel's decision not to call Martin] 'might be considered sound trial strategy.'" *Id.* In conducting its review, an important component of a court's deference to counsel's judgment is the extent to which counsel based his decision on a reasonable investigation of the facts:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-691; *see also Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006) ("To fail to interview any witnesses or prospective witnesses was a shocking dereliction of professional duty").

In her affidavit, Martin swears that Petitioner's counsel never contacted her regarding her knowledge of Petitioner's activities on the night of the attack and the brown Ford Grenada. (Martin Aff., ¶ 4.) The affidavits of Lorraine Washington and Mary Stuckey also allege that they called Petitioner's counsel on several occasions trying to arrange interviews but the calls were never returned. (Exhibit E at C121-22.) The state court did not hold an evidentiary hearing to investigate these allegations. Consequently, it is unclear whether Petitioner's counsel was ever made aware of

Martin's potential testimony or what efforts counsel took to investigate the facts she alleged. Likewise, there is no record of counsel's reason for not calling Martin to the stand. While reasons not to call Martin likely existed – such as her bias – any conclusion that counsel's choice was a conscious and informed one would be pure speculation. On the existing record, it is not possible to conclude that counsel's failure to speak with Martin (a person with possibly helpful information) or call her to testify was trial strategy. Accordingly, this Court will assume that counsel's performance in this regard was deficient.

### 2.    Prejudice to Petitioner

Regardless of whether counsel's failure to investigate Martin's testimony pushed his performance below a standard of objective reasonableness, Petitioner must establish both prongs of *Strickland* in order to gain relief. *See Ashford v. Gilmore*, 167 F.3d 1130, 1135 (7th Cir. 1999) ("[F]ailure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim"). Prejudice is proved when a petitioner can show that his counsel's missteps likely affected the outcome of the trial. *See United States v. Morrison*, 946 F.2d 484, 500 (7th Cir. 1991) ("Whether such a reasonable probability exists [that counsel's performance affected the trial's outcome] depends, of course, on the nature of strength of the government's case against him, and the nature of his attorney's failures"); Strickland, 466 U.S. at 694 ("[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome") . As to the prejudice prong, this Court finds that the Illinois Appellate Court's decision that no prejudice resulted from the failure to call Martin was not unreasonable.

To demonstrate the prejudice caused by Martin not testifying, Petitioner relies on *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003). In *Hampton*, a large group of men attacked three Latino concertgoers at the Chicago International Amphitheatre. *Id.* at 222. The attackers removed the victims' clothes, took their wallets and jewelry, beat them, and sexually assaulted the two women. *Id.* Security guards eventually intervened and rescued the three victims of the assault. *Id.* None of the perpetrators was detained at the scene. *Id.* Several witnesses, including one of the victims, identified Hampton as one of the assailants. *Id.* at 222-24. No physical evidence tied Hampton to the assault. *Id.* at 249-50. Hampton's defense consisted of one witness, a detective that testified that no one picked Hampton out of a lineup. *Id.* at 226. In support of a state petition for postconviction relief, Hampton submitted an affidavit stating that he had given his attorney the names, addresses, and telephone numbers of three witnesses that would confirm that he had not participated in the attack. *Id.* at 227. Two of these potential witnesses also submitted affidavits stating that Hampton's attorney had never contacted them. *Id.* On these facts, the Seventh Circuit affirmed the district court's finding that counsel's failure to look for and contact the witnesses identified by Hampton was unreasonable and that counsel's ineffectiveness prejudiced Hampton's right to fair trial. *Id.* at 251-53.

Several facts essential to the court's finding of prejudice in *Hampton* are absent from Petitioner's claim. First and foremost, the potential witnesses in *Hampton* were exculpatory. Next, there was a substantial question in *Hampton* regarding the witnesses' ability to identify accurately those individuals that participated in the attack. Third, Hampton's counsel did not call any witnesses to support his claim that he had not been involved in the attack.

In cases where the absent testimony would not exculpate a defendant or substantially impeach

material testimony from a government witness, prejudice rarely occurs from the failure to call a witness at trial. *See Montgomery v. Petersen*, 846 F.2d 407, 415 (7th Cir. 1988) ("[U]nlike so many cases involving a similar claim of failure to call potential witnesses, the petitioner has pointed to a specific witness whose missing testimony would have been exculpatory"). Martin's testimony is not exculpatory. She stated in her affidavit that when she beeped Petitioner, he told her that he was calling back from the Tropic Lounge. (Martin Aff., ¶ 2.) Assuming that Petitioner actually was at the Tropic Lounge, his call to her occurred well after the attack on T.S. The police already had been to the home of Petitioner's mother searching for his brother. (Martin Aff., ¶ 1.) Thus, Martin cannot testify regarding Petitioner's whereabouts at the time of the attack – that is, she cannot provide him with an alibi or affirmatively say that he did not participate in the assault. *See, e.g., Raygoza v. Hulick*, 474 F.3d 958, 965 (7th Cir. 2007) (petitioner prejudiced where his counsel failed to interview seven alibi witnesses whose stories were corroborated by telephone records and train tickets); *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (additional witnesses "would have added a great deal of substance and credibility to [petitioner's] alibi").

Martin also stated that her brown Ford Grenada had no rear bumper on which to tie anything. Petitioner believes that this statement would have impeached the victim's testimony regarding her injuries. To start, it is a considerable leap from the fact that the Grenada lacked a bumper to the victim lying about being dragged behind it. On this point, T.S.'s severe injuries corroborate her testimony. As such, even if the lack of a bumper on the Grenada cast some doubt on the victim's account, that fact alone would not render T.S.'s testimony unbelievable or exculpate Stuckey of the crime. *See Montgomery*, 846 F.2d at 415 ("[I]t did not merely raise doubts about the petitioner's guilt; if believed by the jury, it would have directly exonerated him of the crime"); *United States ex*

*rel. Cosey v. Wolff*, 727 F.2d 656, 658 n. 3 (7th Cir. 1984) (witnesses "would not only have

corroborated [petitioner's] story and further impeached the victim's version, but . . . if the witnesses

were believed, their testimony alone would have entirely exculpated [petitioner]"). Finally, Martin

is not an independent or unbiased witness, she was one of Petitioner's girlfriends when the crime

occurred. *See Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir. 1984) ("Having independent

witnesses corroborate a defendant's story may be essential"). Ultimately, neither Martin's potential

testimony regarding Petitioner's call from the Tropic Lounge or the lack of a bumper on her car

would serve to exculpate Petitioner or substantially impeach the victim's testimony.

In addition to the non-exculpatory nature of the potential testimony, the reliability of the

victim's identification of Petitioner also obviates any prejudice caused by the absence of Martin's

testimony. In *Hampton*, "[n]one of the three individuals who identified Hampton as an assailant

knew Hampton, and none of those three witnesses had more than a momentary glimpse of the

assailant whom they identified as Hampton." *Hampton*, 347 F.3d at 250. Also, the witnesses "got

that look under conditions that were anything but ideal: the attack was chaotic and perpetrated by

a large group of people, and the house lights in the Amphitheatre had been dimmed for the concert."

*Id.* Given the potential unreliability of the eyewitness testimony, it would have been critical for the

jury to hear from other witnesses that would testify that Hampton was not involved. *Id.* at 253, citing

*Wright v. Gramley*, 125 F.3d 1038, 1043 n. 4 (7th Cir. 1997) (noting cases on the unreliability of

eyewitness testimony). In contrast, the victim who identified Petitioner as one of her assailants knew

him. T.S. had spent the previous day with Stuckey and her father witnessed her in Petitioner's car

on the afternoon before the assault. The license plate number that T.S.'s father took down that

afternoon matched the Granada that Stuckey often drove. As Petitioner's counsel ably pointed out

at trial and argued to the jury, there were several possible reasons to doubt the victim's testimony. But under the circumstances, Martin's testimony would not have further impeached the victim's identification and Petitioner was not prejudiced by its absence.

Last, Martin's testimony was cumulative of the testimony offered by Lorraine Washington. Ms. Washington, who was living with Petitioner in Atlanta when he was arrested, testified that Petitioner was at the Tropic Lounge from 9:30 p.m. to 4:00 a.m. This is not to say that Martin's bolstering of Ms. Washington's testimony may not have been helpful, but their overlapping nature greatly diminishes any possible prejudice. In *Hampton*, although counsel vigorously attacked the vulnerabilities in the identifications made by the State's eyewitnesses, he presented "no testimony to affirmatively counter the prosecution's witnesses – *i.e.,* from eyewitnesses who would have testified that Hampton did not participate in the attacks." *Id.* at 253. For this reason, the testimony from the uncalled eyewitnesses in *Hampton* could not fairly be described as cumulative. Ms. Washington's testimony, on the other hand, already provided Petitioner with an alibi for the time of the assault. As such, Martin's similarly biased testimony that he called her from the Tropic Lounge at a time after the attack likely would not have influenced the jury's verdict. *See Montgomery*, 846 F.2d at 415 (noting importance of "unbiased" alibi defense).

During the trial, Petitioner's counsel impeached T.S.'s testimony by forcing her to admit that she lied to police as well as to a psychologist assigned to treat her. In arguing reasonable doubt to the jury, counsel pointed out this impeached testimony, Petitioner's alibi witness Ms. Washington, and the absence of any physical evidence connecting Petitioner to the crime. Even assuming counsel acted ineffectively in not calling Martin to testify, there is not a reasonable probability that absent this failure the outcome of Petitioner's trial would have been different. *See Raygoza*, 474 F.3d at

963 ("It is counsel's performance as a whole that matters").  Thus, no prejudice resulted and Petitioner was not denied his constitutional right to effective assistance of counsel.

### B. Hospital Photo Array

An assistant state's attorney went to the hospital and showed T.S. a photo array after she had been attacked.  T.S. identified Petitioner by groaning and nodding when she saw his photo.  Despite two defense motions made prior to trial, the pictures from the hospital photo array were never produced to the defense.  The photo array apparently was unavailable because it was sealed during the appellate process of petitioner's co-defendants who also were identified by the victim at the hospital.  Petitioner charges that his counsel was ineffective for failing to suppress the hospital photo identification and for failing to move for discovery sanctions when the State did not comply with the rules of discovery.

Petitioner did not raise any issues regarding the hospital photo array on his direct appeal.  On state habeas, the Illinois Circuit Court held that waiver and res judicata barred consideration of the issues.  The Illinois Appellate Court nevertheless addressed their merits.  The Appellate Court examined whether there was a reasonable probability that a motion to suppress or for discovery sanctions would have been granted.  Finding that such motions would have been unsuccessful if brought, the Appellate Court found no attorney ineffectiveness.  *See A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion").  Petitioner did not raise these issues in his petition for leave to appeal to the Illinois Supreme Court from the denial of his state habeas petition.  Issues that are not raised at every level of the appellate or post-conviction process cannot be reviewed by a federal court in a habeas

proceeding unless the petitioner can show that not considering the issues will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750; *O'Sullivan*, 526 U.S. at 848. Because Petitioner has not made a compelling case that allowing the introduction of the hospital identification contributed to the conviction of an innocent person, this Court is barred from considering his issues related to the identification. *See Schlup*, 513 U.S. at 315; *Lee*, 534 U.S. at 405.

### III. Ineffective Assistance of Appellate Counsel

Petitioner argues that he was denied the effective assistance of counsel on direct appeal because his attorney failed to: (a) raise trial counsel's ineffectiveness; (b) raise an issue of the State's mishandling of the Vitullo kit; (c) raise any other issues that should have been evident from the record. The effectiveness of appellate counsel can be raised as an independent ground for habeas relief or to show cause for a petitioner's procedural default. *See Franklin v. Gilmore,* 188 F.3d 877, 883 (7th Cir. 1999) ("Attorney error that constitutes ineffective assistance of counsel is cause to set aside a procedural default"). But whether it is brought as an independent ground or used to show cause, an ineffective assistance of appellate counsel claim must itself be exhausted in the state courts. *See Murray v. Carrier*, 477 U.S. 478, 489 (1986). While Petitioner raised the issue of his appellate counsel's effectiveness before the Circuit Court in his state post-conviction petition, he failed to raised the issue again before the Appellate Court or the Supreme Court. As such, Petitioner has procedurally defaulted his ineffective assistance of appellate counsel claim.

Even if the claim was not procedurally defaulted, it would fail on its merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State"). First off, appellate counsel only can be ineffective in failing to raise meritorious issues. *See Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001). In this regard, because Petitioner did not receive constitutionally ineffective trial counsel, appellate counsel cannot be ineffective in failing to raise the issue on appeal. *See Whitehead v. Cowan*, 263 F.3d 708, 731-32 (7th Cir. 2001). As to the State's mishandling of the Vitullo kit, appellate counsel's performance is objectively unreasonable when he fails to appeal an issue that is both obvious and clearly stronger than the ones raised. *Winters*, 274 F.3d at 1167. On appeal, Petitioner, through his counsel, contended that: (1) the victim's identification was insufficient to prove guilt beyond a reasonable doubt; (2) the prosecution's comments during rebuttal closing argument were improper and deprived him of a fair trial; (3) the court abused its discretion in sentencing him to extended, consecutive terms of 60 years for attempted murder and 40 years for aggravated criminal sexual assault; and (4) he was deprived of the effective assistance of counsel where counsel failed to object to the prosecutor's comments and Petitioner's sentence. At trial, Petitioner's counsel consistently pointed out the lack of physical evidence tying Petitioner to the crime. Given trial counsel's efforts in this area and the relative strength of the other issues appealed, appellate counsel was not unreasonable in failing to appeal trial counsel's effectiveness related to the Vitullo kit. *See Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) ("Appellate lawyers are clearly not incompetent when they refuse to follow a 'kitchen sink' approach to the issues on appeals").

## IV.    Constitutionality of Petitioner's Sentence

Petitioner contends that his extended term sentence is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Apprendi held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

reasonable doubt." *Id.* at 489. Petitioner's conviction became final on March 23, 1998 – 90 days after December 3, 1997, the date on which the Illinois Supreme Court denied his petition for leave to appeal. *See Anderson v. Litscher*, 281 F.3d 672, 674-75 (7th Cir. 2002). "Apprendi . . . does not disturb sentences that became final before June 26, 2000, the date of its release." *Curtis v. United States,* 294 F.3d 841, 844 (7th Cir. 2002); *see Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (holding that *Ring v. Arizona*, 536 U.S. 484 (2002), which applied *Apprendi* to state death penalty enhancements, is not retroactive). Petitioner therefore cannot use *Apprendi* to attack collaterally his sentence.

### Conclusion and Order

Because Petitioner failed to exhaustively raise several issues to the state courts, has not established that he was denied his constitutional right to an evidentiary hearing or effective assistance of counsel, and his sentence cannot be challenged under *Apprendi*, Petitioner is not being held in violation of the Constitution or laws or treaties of the United States. Wherefore, his Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 is dismissed in part and denied in part. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 9, 2007